Benjamin G. Arnold et al., Appellants, *v.* The Pacific Mutual Insurance Company, Respondent.

Defendant issued to plaintiff an open policy of marine insurance, covering one sixth of all goods consigned to the latter upon vessels from Santos "to New York, Baltimore or Boston direct, or *via* Hampton Roads for orders." The rate of premium was stated to be "one (net throughout the year) per cent." Risks were to be reported for indorsement on the policy as soon as known. Plaintiffs' agent shipped at Santos, on board

of a barque chartered for that purpose, a large cargo of coffee. The charter party specified a voyage from Santos to New York, Philadelphia or Baltimore *via* Hampton Roads for orders. Plaintiffs' agent, by mistake, reported the risk to defendant as from Santos to New York direct, and it was so entered upon the policy. The barque arrived safely at Hampton Roads, and there remained at anchor for eighteen days, when she was sunk and the cargo lost. In an action upon the policy, *held,* that in the absence of any proof of damages occasioned to defendant by the mistake, plaintiff was not bound by an insurance upon the risk as reported ; that the moment the cargo was loaded for the voyage the policy attached, and unless damage to the underwriters could be shown, the erroneous declaration could be corrected even after a loss, and the case was to be treated as if the proper declaration and indorsement had been made ; and that therefore there was no deviation in going into Hampton Roads for orders.

*O. M. Ins. Co.* v. *Wright* (23 How. [U. S.], 401), distinguished.

The morning after the arrival of the vessel at Hampton Roads, the master telegraphed plaintiffs at New York that he had arrived, and was waiting orders. In three or four days thereafter he received a letter directing him to await instructions. He heard nothing further until after the loss. He received the same day a letter, dated the day before, directing him to sail for New York. From the time they received notice of the arrival until the loss, plaintiffs and their agents at New York and Baltimore were constantly engaged in unsuccessful efforts to sell the coffee. *Held* (CHURCH, Ch. J., and FOLGER, J., dissenting), that plaintiffs were entitled under the policy to a reasonable time, after the arrival at Hampton Roads, to find a purchaser for the coffee at either of the specified ports ; and that it could not be said as matter of law that the delay in this case was unreasonable, and so a deviation and breach of the policy.

After the loss two indorsements were made upon the policy. One an agreement that in case of the detention of a vessel thereafter at the place for orders beyond seven days, an extra premium should be paid ; the other, fixing a rate of extra premium in case of a vessel using a place of call exceeding seven, and not over fifteen days. *Held,* that these indorsements did not affect the rights of the assured as to the port of call, but showed that the parties understood at the time that under the policy the assured might have occasion to remain at Hampton Roads for more than seven, or even fifteen days.

Also *held,* that the fact that the charter party was for a voyage to New York, *Philadelphia* or Baltimore, while the insurance was upon a voyage to New York, Baltimore or *Boston,* had no bearing upon the controversy, as the assured was not bound, either under the charter party or the policy, to choose the port of discharge until the arrival at Hampton Roads, and a mere intention before arrival at that place to go to Philadelphia would not have constituted a variation.

The nature and characteristics of open policies of insurance stated, and the authorities in reference thereto collated.

*It seems,* that every unreasonable or unexcused delay in commencing or prosecuting a voyage, whether the delay be in some port or on the high seas, is a variation in the risk insured which will discharge the underwriter.

But if not expressly prohibited by the policy, and if justified by necessity, or incurred *bona fide,* with a view to the purposes of the voyage insured, a delay will not discharge the underwriters, although it be of considerable duration.

Whether the delay be reasonable or not must be determined, not by any positive or arbitrary rule, but by the facts.

Where the assured has a right to stop at a port of call, a mere intention formed before reaching that port to go to an unauthorized port of discharge is not a deviation. To constitute such deviation the vessel must have entered upon her voyage to the unauthorized port.

*Arnold* v. *P. M. Ins. Co.* (14 Hun, 83), reversed.

(Argued May 19, 1879; decided September 16, 1879.)

APPEAL from order of the General Term of the Supreme Court, in the first judicial department, reversing a judgment in favor of plaintiffs, entered upon a verdict, and directing a new trial. (Reported below, 14 Hun, 83.)

The nature of the action and the facts are set forth sufficiently in the opinion.

*John E. Parsons,* for appellants. The policy attached immediately upon the lading of the coffee on board at Santos, and without reference to any report, declaration or indorsement of the risk on the policy. (*E. Carver Co.* v. *Manuf. Ins. Co.,* 6 Gray, 214; Weskett on Ins., 517; 1 Pars. Mar. Ins., 317; 1 Arn. on Ins. [4th ed.], 318; *Rolker* v. *G. W. Ins Co.,* 4 Abb. Dec., 76.) The first stage of the voyage was identical with the voyage insured, and the vessel not having deviated therefrom, even if the charter party showed an intention to do so, it would not amount to a deviation. (1 Arn. on Ins. [4th ed.], 417; 2 Pars. on Mar. Ins., 5; *Hare* v. *Travis,* 7 B. & C., 14; *Richardson* v. *Mar. F. and M. Ins. Co.,* 6 Mass., 102; *Merrill* v. *Boylston Ins. Co.,* 3 Al., 247; *Lawrence* v. *Ocean Ins. Co.,* 11 J. R., 241; *Heselton* v. *Allnutt,* 1 M. & S., 46.) The mistake in reporting the shipment as "to New York" instead of "to Hampton

Roads for orders," did not affect plaintiffs' right to recover. (*Robinson* v. *Tournay*, 3 Camp., 158; *Ionides* v. *Pac. F. and M. Ins. Co.*, L. R. [6 Q. B.], 674; *Gledstanes* v. *Royal Ex. Ins. Co.*, 5 B. & S., 797; *Stephens* v. *Aust. Ins. Co.*, L. R. [8 C. P.], 18; 1 Arn. Ins. [4th ed.], 318, 320.) The delay at Hampton Roads for orders was not a deviation. (*Col. Ins. Co.* v. *Catlett*, 12 Wheat., 383; *Bain* v. *Case*, 3 C. & P., 496; *Oliver* v. *Md. Ins. Co.*, 7 Cranch, 490; *Coffin* v. *N. Mar. Ins. Co.*, 9 Mass., 447, 450; *Hamilton* v. *Sheddon*, 3 M. & W., 49; 2 Pars. Mar. Ins., 9, 10, and notes; 1 Arn. on Ins. [4th ed.], 454–458; *Grant* v. *King*, 4 Esp., 175; *Suydam* v. *Mar. Ins. Co.*, 2 J. R., 138; *Gilfert* v. *Hallet*, 2 J. Cas., 296.) Unless the court holds as matter of law that the stay at Hampton Roads was a deviation, the verdict cannot be impugned therefor. (*Leggett* v. *Hyde*, 58 N. Y., 272; *Stone* v. *Flower*, 47 id., 566; *Barnes* v. *Perine*, 2 Kern., 18.)

*Joseph H. Choate*, for respondent. Under the policy as soon as a risk was reported and indorsed upon it, the agreement of the parties was thereby fixed and determined. (*Orient Mut. Ins. Co.* v. *Wright*, 23 How. [U. S.], 401, 406; 1 Arn. on Ins., chap. 7, § 2, pp. 174–179.) The detention of the vessel at Hampton Roads was a deviation which avoided the policy. (1 Pars. on Mar. Ins., 126; *Schuylkill Nav. Co.* v. *Moore*, 2 Wheat., 491; 1 Phil. on Ins., §§ 981, 1002; 1 Phil on Ins. [2d ed.], 352; *Oliver* v. *Md. Ins. Co.*, 7 Cranch, 490; 1 Kay's Shipmasters and Seaman, 293; *Pearson* v. *Com'l Un. As. Co.*, 15 C. B. [N. S.], 304, 314; *Samuel* v. *Royal Ex. As. Co.*, 8 B. & C., 119; Arn. on Ins. [Eng. ed., 1872], 453; *King* v. *Mid. Ins. Co.*, 1 Conn., 197; *Sage* v. *Mid. Ins. Co.*, 1 id., 239.)

EARL, J. This is an action upon an open policy of marine insurance. It is specified in the policy that the insurance was to cover one-sixth of all goods consigned to the plaintiffs upon vessels from Santos, in Brazil, "to New

York, Baltimore or Boston direct, or *via* Hampton Roads for orders." The rate of insurance was "*one (net throughout the year)* per cent, with additions and deductions to conform to the rates of the company, when the character of the risk and vessel, and time of sailing, are known." The words in italics were written; the others, printed. It was also provided in the policy as follows: "Risks applicable hereto to be reported to this company for indorsement on the policy as soon as known to the assured."

Plaintiffs' agents in July, 1872, shipped at Santos, on board of the barque "Eliza and Maria," chartered for that purpose, a large cargo of coffee, valued at over $100,000 in gold. The charter-party specified a voyage from Santos to New York, Philadelphia or Baltimore, *via* Hampton Roads for orders. The vessel sailed July tenth, and August first, the plaintiffs having received the charter-party and advices of the shipment of the coffee through their brokers, reported the risk to the defendant as follows: "Enter on open policy of B. G. Arnold & Co. $18,279 gold on ⅙ of goods as per policy, valued at $109,675, on board Br. Eliza & Maria, from Santos to New York;" and there was indorsed upon the policy accordingly the following: "Aug. 1, 1872, barque Eliza and Maria, Santos to New York, $18,279, one per cent premium, $182.79."

The vessel arrived at Hampton Roads in safety on the twenty-fifth day of August, and there remained at anchor until she was run into and sunk by a steamer on the thirteenth day of September, eighteen days after her arrival, and her cargo became a total loss. This action is to recover the insurance for the loss thus sustained by the plaintiffs.

The defendant relies upon two defenses, which I will notice separately.

First. The risk, as reported by the plaintiffs to the defendant and indorsed upon the policy, was one from Santos to New York; and the claim is that, after it was thus reported, the insurance became one for a voyage from Santos to New York direct, and that by sailing into and stopping at Hamp-

ton Roads there was such a deviation as to constitute a breach of the policy.

It was clearly proved that the risk was thus reported by mistake. The charter party required the master of the vessel to call at Hampton Roads, and to the same effect were his written instructions. It was the intention of plaintiffs' agents to report the risk truly, but by an oversight, they omitted to specify that the voyage was " *via* Hampton Roads for orders." There was no proof that defendant was in any way harmed by the mistake. The question, therefore, is, whether the plaintiffs were bound by an insurance upon the risk as thus reported, in the absence of any damage occasioned to the defendant by the mistake ?

The general rule is that the property insured must be specified in the policy. But open or running policies are an exception to this rule. They were brought into use to enable merchants to insure their goods shipped at distant ports, when it is impossible for them to know the precise quantity or character of the goods, or the particular ship in which they are shipped, and thus unable to describe accurately or particularly the subject of insurance : (1 Arnold on Marine Insurance [4th ed.], 318.) These policies generally, if not universally, require that the risk shall be declared or reported to the underwriter as soon as known to the assured. This requirement was said in *The Carver Co.* v. *Manuf. Ins. Co.* (6 Gray, 214), to be based upon these reasons : " To identify the property insured ; to know what was at risk, that they might protect it ; to ascertain when the policy was exhausted ; and as evidence of the sums at risk and premium earned." In this case, the moment the cargo was loaded for the voyage the policy attached. It was provided in the policy that it was to cover " one-sixth of all shipments made," as therein specified, and that the policy was " to cover all shipments made by vessels sailing prior to the 31st day of December, 1872." It was intended that the insurance should cover all merchandise shipped by the assured in good seaworthy vessels from Santos upon the

voyages named.  Nothing remained to be agreed upon.  All the terms of the agreement were definitely determined. The rate of premium was one per cent net throughout the year, whether the voyage was direct to one of the ports named or *via* Hampton Roads for orders.  The written part of the clause in the policy regulating the premium must prevail, and such was the practical construction given to this policy by the parties in the many indorsements of risks thereon.  There was no room, so far as I can discover from the evidence, for the application of the printed portion of the same clause as " to additions and deductions to conform to the rates of the company."  The rate was not merely nominal, as it is in many of these policies, but was determined when the policy was made for all the risks to be covered thereby.  This is not like the case of *The Orient Mut. Ins. Co.* v. *Wright* (23 How. [U. S.], 401).  In that case something was to be done after the declaration of the risk to the underwriter to make the contract complete. Here nothing was to be done at the time or after the declaration of the risk to make the contract complete. Even if the assured made no declaration, the underwriter could claim that the property was covered by the policy and claim the premium for insuring it.  The assured could not deprive it of its premium by simply omitting to report the risk.  It was entitled to a premium upon all goods shipped from Santos upon the specified voyages.  If the assured willfully or fraudulently refused to report a risk, they could not claim that it was yet covered by the policy. But if by accident or mistake, or some unavoidable necessity, the risk should not be reported before the loss under such a policy as this, it cannot be doubted, it seems to me, that the risk would yet be covered by the policy.  In such a case, the risk could be declared after the loss, and the declaration would be just as effectual then as if made before, unless damage to the underwriter from the delay could be shown.  And if by mistake an erroneous declaration be made, it may be corrected even after the loss.  In *The E.*

*Carver Company* v. *Manuf. Ins. Co., supra,* the risk was reported after the loss. In 1 Arnold on Marine Insurance, 319, it is said : " It is not, however, necessary that this declaration should be in writing; and even if written on the policy, an error as to the name of the ship will not be fatal to the contract." And at page 320 it is said : "As a general rule, the name of the ship ought to be declared before notice of the loss. Cases, however, may occur in which this would be impossible, as when the assured does not ascertain the name of the ship until he hears of her loss ; this, therefore, never is a condition precedent to the assured's right to recover on the policy." *In Robinson* v. *Touray* (3 Camp., 158), there was an open policy of insurance, and the broker, in declaring the risk, made a mistake in the name of the vessel ; and Lord Ellenborough held that the declaration formed no part of the contract and did not require the signature or assent of the insurer ;. the mistake being a mere blunder, might be corrected without a fresh stamp, and that the policy attached upon the goods shipped in the vessel named in the corrected declaration, in the same manner as if the first declaration had never been made. To the same effect as these authorities are the cases of *Gledstanes* v. *Royal Exch. Ins. Co.* (5 Best and Smith, 797), and *Stephens* v. *Australian Ins. Co.* (L. R. [8 C. P.], 18).

This case must, therefore, be treated as if the proper declaration and indorsement had been made, and there was, therefore, no deviation in going into Hampton Roads for orders.

Second. The further claim is made, on the part of the defendant, that there was a breach of the policy in remaining at Hampton Roads for the eighteen days. The plaintiffs had the right, as between them and the defendant, after notice of the arrival of the vessel at Hampton Roads, to order her to New York, Baltimore or Boston. ·But the claim of the defendant is that they did not have the right to so long a time in which to give the order, and that no delay there can be justified, beyond what was necessary for the captain to

communicate with the plaintiffs and receive their instructions as to a port of discharge.

This vessel reached Hampton Roads about 8 o'clock P. M. of August twenty-fifth. The next morning the captain telegraphed the plaintiffs at New York that he was there awaiting their orders. The following day he received a telegram from them directing him to send a box of samples of the coffee to their agents at Baltimore; and in three or four days he received a letter in reply to his telegram telling him to await their instructions as to the port where he should go to discharge his cargo. He heard nothing more from them until after the loss of his vessel, about one o'clock A. M. on the thirteenth day of September. On the same morning he received a letter from them, dated September twelfth, directing him to sail for New York on the sixteenth, unless in the meantime they directed him otherwise by telegraph.

The plaintiffs received samples of the coffee by steamer before the arrival of the vessel at Hampton Roads; and from the time they had notice of the arrival until the vessel was lost they and their agents at New York and Baltimore were constantly engaged in efforts to sell the coffee. There was quite a depression in coffee, in consequence of large failures in the coffee trade at Baltimore, and the plaintiffs were unable to effect a sale of this coffee, and therefore finally concluded to order the cargo to New York. The sole reason for delaying the order so long was their inability to make a sale of the coffee.

We have been able to find in the books no case in which the precise phrase *via* an intermediate port "for orders" has been under consideration. We may receive some aid, however, by consulting the cases in which the similar phrases "to call," "to touch," "to touch and stay," or "to enter," at intermediate ports have been under consideration.

The plaintiffs were known to the defendant, as we may infer, to be extensively engaged in the coffee trade, importing and selling coffee by the cargo. They had under this policy the right to discharge any cargo at either one of three ports.

The privilege of stopping the vessel with the cargo at Hampton Roads for orders was secured to enable them, after the arrival of the vessel, to direct to which port she should go for discharge. The plain object of having the three ports specified was that they might have the choice, and thus be able to send the vessel to the port where there was the most favorable market for the sale of coffee. That they could have the benefit of this choice, they must have time after the arrival of the vessel to ascertain which is the best market, otherwise the right to choose would be of no benefit. They could not be expected to make the choice before the arrival of the vessel, because they might not know of the shipment until the arrival, and they could not generally know precisely when the vessel would arrive, nor the condition in which the cargo would be upon its arrival. They could not be expected. to put the coffee upon the market anywhere, until they could exhibit samples of it and have it in hand to sell; and a suitable way certainly to test the market was to offer the coffee for sale. Such being the construction of the language used, the plaintiffs were entitled to a reasonable time, after the arrival of the vessel at Hampton Roads, to find a purchaser for the coffee at either of the ports specified.

It is conceded that every unreasonable or unexcused delay in commencing or prosecuting a voyage, whether the delay be in some port or upon the high seas, is a variation of the risk insured, which will discharge the underwriter. In the words of Chief Judge TINDAL, in *Mount* v. *Larkins* (8 Bing., 108): "The voyage, in the commencement or prosecution of which any unreasonable delay takes place, becomes a voyage at a different period of the year, at a more advanced age of the ship, and, in short, a different voyage than if it had been prosecuted with reasonable and ordinary diligence; the risk is altered from that which was intended by all parties when the policy was effected." But it is only, however, an unreasonable or unexcused delay, that is a voluntary and unnecessary waste of time that will amount to a deviation;

if justified by necessity or incurred *bona fide*, with a view to the purposes of the voyage insured, the underwriter will not be discharged by the delay, although its absolute duration may be very considerable. "To discharge the policy," says Lord ELLENBOROUGH, in *Grant* v. *King* (4 Esp., 175), "there must be a clear imputation of waste of time. Mere length of time elapsing between the sailing of the vessel and the underwriting of the policy is not of itself sufficient ; for it is capable of explanation." Judge STORY, in *Columbian Ins. Co.* v. *Catlett* (12 Wheat., 383), says : "What delay will constitute a deviation depends on the nature of the voyage and the usage of trade. That delay which is necessary to accomplish the objects of the voyage according to the course of the trade, if incurred *bona fide*, cannot be admitted to avoid the insurance." Delay not expressly prohibited by the policy for a reasonable time, for the purpose of the adventure, must always in such cases be allowed ; and whether the delay be reasonable or not, must be determined, not by any positive or arbitrary rule, but by the state of things existing at the time.

We cannot say, as matter of law, upon the facts of this case, that the delay was unreasonable. There was a temporary depression in the coffee trade, and the market was dull and unfavorable. The cargo was large, being upwards of 600,000 pounds of coffee ; and the plaintiffs made constant efforts during the delay to find a market for the same. There was no rule or usage of commerce which required them to discharge the cargo and then seek a market. By so doing, they would have been subjected to the risk either of selling in an unfavorable market or of reshipping the goods. To avoid such risk, they had the right to detain the vessel at Hampton Roads for the brief period, before ordering her to a port of discharge. The delay was not for a purpose unconnected with the voyage. It appears to have been in good faith, and it cannot be said that there was any waste of time. All marine insurances upon merchant vessels are made with a view to the conveniences, needs and exigencies

of commerce; and that there might be such delay as took place here, for the reason here shown, may be assumed to have been within the contemplation of the parties.

A reference to a few authorities will fortify more fully the conclusion thus reached. Where there is an insurance upon goods or a vessel from one country to a port of discharge in another country, the assured is not bound to select a port of discharge before reaching the country of his destination. But he may sail into any port there, for the purpose of ascertaining where he can find the best market; and for that purpose he may remain a reasonable time in such port without breach of his policy, and then sail to a port of discharge there selected. In *Coolige* v. *Gray* (8 Mass., 527), the court said : " That when property is insured to a port of discharge, the assured has a right to obtain advice at his port of arrival respecting the markets, and having informed himself, has a right to proceed to such port as promises the best sales, and is still protected by the policy; not being obliged to discharge his cargo at the first port he makes ; " and in that case the delay was eight days. To the same effect is the case of *King* v. *The Middletown Ins. Co.* (1 Conn., 184). In these cases the law is broadly laid down, that when a party is insured to a port of discharge in any country, he has the right to sail into a port of such country, and remain there a reasonable time to inquire into the state of the markets, so as to select a favorable port of discharge and not be obliged to sell in a market already glutted. Under these authorities, if this insurance had been simply to a port of discharge in the United States or to either one of the three places named as a port of discharge, the vessel could have sailed into Hampton Roads and remained there for a reasonable time, to enable the assured to inquire into the state of the markets, and thus select the most favorable port of discharge : (*Clark* v. *The United F. and M. Ins. Co.*, 7 Mass., 365; *Lapham* v. *The Atlas Ins. Co.*, 24 Pick., 1.) Have the assured any less right where express permission is given to call at an intermediate port for orders ?

In *Columbian Ins. Co.* v. *Catlett (supra)*, a cargo of flour being insured to St. Thomas and two other West India ports, it was held that a delay from March twenty-one to May thirty-one, for the purpose of disposing of the cargo, was not a deviation, although the cargo could have been sooner sold, but for a limitation put upon the price by the assured. In *Gilfert* v. *Hallet* (2 Johns. Cases, 296), the insurance being upon goods from New York to Barracoa with liberty to touch at one or two ports on the north side of Cuba, the vessel arrived at Barracoa June twenty-sixth, and staid there until October thirtieth, the supercargo in the meantime being engaged in efforts to sell the cargo, and the delay was held to be no deviation. In *Metcalfe* v. *Parry* (4 Camp., 124), the insurance on the ship being from Antigua to England, with liberty to touch at all or any of the West India Islands, the ship was not able to procure a full cargo at Antigua, and sailed from there to St. Kitts November tenth, and remained there to complete her cargo until January fifteenth; and it was held that the delay there was no deviation. (See also *Thorndike* v. *Bordman*, 4 Pick., 471; *Chase* v. *The Eagle Ins. Co.*, 5 Pick., 51; 2 Pars. on Mar. Ins., 16, and cases cited in note.) As a result of all the authorities, we may say that in the case of all liberty policies, the parties have in view some purpose for which the liberty " to call at " or " to enter " or " touch at" ports is given. What such purpose is may be inferred from the character of the voyage and of the cargo, and the circumstances and nature of the adventure, and reasonable delay at the authorized port to accomplish such purpose, is not a deviation. A delay for an unreasonable or unnecessary time, or for a purpose not authorized, is a deviation.

I have thus far not noticed two indorsements made upon this policy after the loss in question, which are claimed to have some bearing upon the construction of the policy. September 28, 1872, this indorsement was made : "It is hereby agreed that in case of detention of any vessel after this date at the place for orders beyond seven days, an extra

premium is to be paid therefor ;" and January 4, 1873, this was made : "It is also agreed that on vessels that use a place of call (exceeding seven days and not over fifteen) one-fourth per cent, less fifteen per cent, is to be charged therefor, the same to be returned if not there more than seven days, and no loss be claimed." These indorsements gave the assured no new or greater right as to the port of call.   They simply changed the rate of premiums in cases of authorized or necessary detentions at such port beyond the times limited.   The liberty to call and remain in the port was still regulated by the policy as originally written. These indorsements show that at the times when they were made the parties understood that, under the original policy, the assured might have occasion to remain at Hampton Roads for orders for more than seven or even fifteen days.

The fact that the charter-party was for a voyage to New York, Philadelphia or Baltimore *via* Hampton Roads for orders, while the insurance was upon a voyage to New York, Baltimore or Boston *via* Hampton Roads for orders, has no bearing upon this controversy.   The assured were not bound, under the charter-party or the policy, to choose the port of discharge until the arrival of the vessel at Hampton Roads. At that port they could, under the charter-party, without violating the policy, choose either New York or Baltimore. A mere intention to go to Philadelphia at any stage of the voyage before reaching Hampton Roads would not have constituted a deviation.   To constitute such deviation, the vessel must have entered upon her voyage to the unauthorized port.

It follows from these views that the order must be reversed and judgment affirmed, with costs.

All concur, except CHURCH, Ch. J., and FOLGER, J., who dissent on the ground that the phrase "*via* Hampton Roads for orders" was to be interpreted as giving the privilege to the insured to delay at that roadstead no longer than a reasonable time for the master to receive orders from the insured to which of the three ports named in the policy he

should sail for discharge; that the phrase did not give the privilege to wait for a change in the markets; and that the delay of eighteen days was a deviation.

Order reversed and judgment affirmed.