# Cases

# FIRST DEPARTMENT

AT

# GENERAL TERM,

## January, 1895.*

EDWARD V. THEBAUD and Others, Plaintiffs, *v.* THE GREAT WESTERN INSURANCE COMPANY, Defendant.

*Marine insurance policy — specifications of the insured vessel admissible — insurance for an ocean trip of a vessel constructed for river navigation — parol evidence of knowledge by the insurer of a breach of covenant — delay of an insured vessel to start — when insurance is not avoided thereby — trial trips — their necessity a question for the jury.*

In an action brought to recover the amount of a policy of marine insurance issued by the defendant, upon a vessel constructed for river navigation, to cover the vessel during an ocean-going trip, the written specifications of the insured vessel presented to the insurer as a necessary step in the application for insurance, and retained by it for its protection, are admissible in evidence as bearing upon the question of the knowledge of the insurer of the character of the vessel.

Where an insurance company and the owner of a vessel attempt to insure for an ocean voyage a vessel which they both well know is not intended for ocean navigation, and is not capable of being made seaworthy as a sea-going vessel, it would seem that the only implication as to seaworthiness which could consistently arise from such intention would be that the vessel should be made as seaworthy for the voyage insured against as a vessel of her kind could reasonably be made.

In an action brought upon a marine insurance policy which contains an express warranty, it is competent, for the purpose of avoiding it, to show by parol evidence that the insurer knew at the time the insurance was effected of the facts constituting a breach thereof.

Where a policy of insurance was issued upon a certain steamer "on voyage," and the insurance read, "at and from Philadelphia to Frontera, Mexico," an

* The other cases of this term will be found in volume 83 Hun.— [REP.

implied warranty is created on the part of the assured, among other things, that the vessel, at the time of the issuing of the policy, was about to sail upon her voyage, subject only to such reasonable delay as should be proper and necessary to enable her to complete her loading and immediate preparations for the voyage, and in an action brought to recover the amount of such policy the question whether the delay of such vessel to start upon her voyage was reasonable or unreasonable is ordinarily a question of fact for the jury to determine, unless the facts are undisputed, in which case the question of delay will be determined as one of law by the court.

The fact that a vessel, after being insured for an ocean trip, before starting on her voyage took one or two trial trips, does not necessarily avoid the policy, and it is for the jury to say whether the trial trips were prudent or necessary where the vessel did not land on the trial trips so taken, and did not, during the trial trips, go out of the limits of the port in which she was at the commencement thereof.

MOTION by the defendant, The Great Western Insurance Company, for a new trial on a case containing exceptions, ordered to be heard at the General Term in the first instance upon the verdict of a jury in favor of the plaintiffs, rendered after a trial at the New York Circuit on the 25th day of January, 1894.

The action was brought to recover the amount of an insurance policy issued by the defendant on the *Dos Hermanos*.

*Everett Masten*, for the plaintiffs.

*Prescott Hall Butler*, for the defendant.

PARKER, J.:

On a former appeal this court reversed a judgment in favor of the plaintiffs on the opinion in *Thebaud* v. *Phœnix Insurance Company*, a companion case. Upon that trial plaintiffs proved that the *Dos Hermanos*, which was insured by the defendant, " at and from Philadelphia to Frontera, Mexico," was built for river navigation, and that she was staunch and strong for the purposes of river and smooth water navigation; but no evidence was offered tending to show that any substantial precaution was taken to protect her against the dangers to which vessels of this construction were peculiarly subject upon the ocean, namely, the action of the sea upon her hull, nor was evidence offered tending to show that the plaintiffs, appreciating her structural weakness, had attempted to strengthen her for an ocean voyage, which the insurance was intended to cover. The court held that the facts did not permit a

submission to the jury of the question of seaworthiness, for, indisputably, the voyage insured against was one for which the vessel was not structurally fitted, and there was an entire absence of evidence tending to show that any additional precaution had been taken for the purpose of providing against the perils of a sea voyage.

The plaintiffs, upon the retrial, have introduced evidence bearing upon all the points which were discussed on the former appeal.

(1) Plaintiffs offered evidence tending to show that the boat was a good, strong and well-constructed vessel of her class. Thomas M. Rees, who had much experience in the construction of similar vessels and was familiar with the peculiarities of their navigation, testified that the *Dos Hermanos* was much more strongly constructed than is usual with vessels of her kind. He said that he constructed the *Tres Hermanos*, which was built from similar specifications as the lost *Dos Hermanos*, and to take her place, and that she was made fifty per cent lighter. Other testimony corroborating Rees as to the character of her construction was given by Lavendeyra, a skilled engineer, who superintended her construction; by Captain Weir, the master of the vessel, who was familiar with vessels of this sort; by Captain Stuart, the defendant's inspector, who was also an experienced engineer and who had examined the *Dos Hermanos ;* and by Captain Swasey, who, in addition to making an examination of her, had charge of her on the first trial trip.

(2) Evidence was also presented for the purpose of showing that the *Dos Hermanos* was made as seaworthy for the ocean portion of the voyage as a vessel of her class could be made. Captain Stuart, who was at one time defendant's inspector, in response to the inquiry " What, if anything, could be done to strengthen the vessel for the sea voyage, which she would necessarily encounter," replied : " Well, to protect her from seas that might break over her it is always well to shut her in with light joiner work, as far as possible, to protect the engines and boilers, and also to protect the vessel from heavy sprays, shipping seas, etc. By shutting her in I mean simply planking her up. She was a vessel with a single deck and houses above. Stanchions run up to the houses. Carry the houses over the top of the stanchions and inclose her with light material that don't weigh her much, just to keep the sea from going in. I don't know of any-

thing more that could be done for the protection of the vessel for a sea voyage.

"That railing or inclosure ought to be extended to protect the boilers forward, and aft to the engines to protect the machinery also. I don't know of any other protection that could be added to such a vessel. I don't know of any, providing that covering is put on properly. That is the only means I know of as far as adding anything to it is concerned. If a railing composed of 3x3 scantling on both sides spiked to the deck stanchion were added to the boat, also partition aft nailed to the after stanchions, and carried up to the upper deck running athwartships were added, that, in my opinion, is the only thing that could be done to her to make the vessel as seaworthy as such a vessel could be made."

All this, it appears from plaintiffs' evidence, was done, and in addition cross timbers, x shape, were fitted under the hurricane deck, to stiffen it in the sea, and heavy wooden stanchions were placed in the hull beneath the deck to strengthen the vessel, and a breakwater fitted forward.

Touching the preparations intended to make her as seaworthy as possible for such a vessel to be, the witness Rees, to whom we have already referred, and who had built a large number of vessels of the same kind which were taken on similar voyages to the south, testified that nothing more could be done to make the vessel seaworthy. He was supported in this position by the testimony of Captain Stuart, Captain Weir and Commander Field. The evidence to which we have referred makes it apparent that the jury were entitled to find, as they have, under a proper submission by the court, that the boat was a well-constructed vessel of her class, and that while not a sea-going vessel, she was made as seaworthy, for the ocean portion of the voyage insured against, as it was possible to make a vessel of her kind. It further appears that defendant's officer, who accepted this risk, knew that the vessel was not an ocean-going steamboat, but, instead, was constructed for river navigation only.

The first evidence tending in this direction was produced by the defendant, and consisted of the specifications in accordance with which the *Dos Hermanos* was then being constructed. These specifications were given to Mr. Smith, defendant's vice-president, by

the broker Bascom who made application for the insurance for plaintiffs, and they were retained thereafter by the defendant, and produced on the trial in response to a notice given by the counsel for plaintiffs.   The first part of the specifications was as follows :

"SPECIFICATION OF A STERN-WHEEL STEAMER.

"Dimensions.—Length, 90 feet; beam, 22 feet; draught, loaded, 33 inches ; depth at side, 4 feet 3 inches."

It is difficult to conceive of anything necessary to be added to the statement we have quoted, in order to assure those entirely familiar with the construction of vessels that the *Dos Hermanos* was not an ocean-going steamboat.

But if more were needed it was furnished by the details of the specifications, which because of their length we refrain from quoting.

Whatever may be urged against the admissibility of the conversations had between the applicant for the insurance and the defendant's representative, for the purpose of showing knowledge on the part of the insurer of the character of the vessel, certainly could have no force as against written evidence of this character, presented to the defendant as a necessary step in the application for insurance and retained by it for its protection.   There was other evidence showing that the defendant not only understood the character of the vessel, but that an increased premium was charged. Captain Stuart, defendant's inspector, prior to the application for the insurance was upon the vessel *Dos Hermanos*, and inspected her by request of the officer in charge.   He testified that the vicepresident, Mr. Smith, who accepted the risk, asked him whether he had seen the steamer, and what he thought of her, and he said in reply : "I had seen it there at Goringes' yard; I told him of course it was a fancy risk; I mean by that simply that she was built for the river trade, and I didn't consider she was just the thing to attempt all weathers on the coast going around there.   *   *   *

"Fancy risk means there ought to be an excessive rate charged, something more than would be usual for an ordinary risk."

It appears that the premium charged was about double the usual rate.

We have presented, then, a case where both the parties attempted to insure for an ocean voyage a vessel which they well knew was

not intended for ocean navigation, and was not capable of being made seaworthy as a sea-going vessel, and it would seem that the only implication as to seaworthiness which could consistently arise from such intention would be, that 'the vessel should be made as seaworthy, for the voyage insured against, as a vessel of her kind could reasonably be made.

It was intended to effect an insurance, and any other implication would defeat such intention and amount to a fraud on the part of the insurer.

The evidence in this case, considered in connection with the inferences of fact, necessarily found by the jury, brings this action within *Burges* v. *Wickham* (3 Best & Smith Q. B. *669), in which case the policy was issued upon a vessel built at Liverpool for river navigation on the river Indus. On account of her construction the vessel was not fitted for ocean navigation. The insurance was sought to cover the risk of the voyage to Calcutta. In an action upon the policy to recover for the loss resulting, the plaintiff had judgment. In discussing the question involved the court said, in part : "The warranty    *    *    *    must be construed in such a way as not to be repugnant to the general adventure in which the parties were engaged.    *    *    *    If such an adventure is insured the underwriters, when fixing the rate of premium, consider what will be the risk if the ship be put in the shape in which she ought to be put on beginning such an adventure, but what that state is must depend on the whole nature of the adventure. The assured warrants that she shall be put in that state, but he warrants no more.    *    *    *    It is true that when it was all done it appears the adventure was more dangerous than an ordinary voyage to India, but the assured do not in any case warrant the prudence of the adventure — that is for the underwriters to consider when fixing the premium, and to enable them to do so the assured are bound to disclose every material circumstance."

*Clapham* v. *Langton* (5 Best & Smith Q. B. *729) was a declaration on a policy of insurance on a ship " at and from the Tyne to Odessa or another port in the Black Sea," the length, breadth, draught and tonnage whereof were specified in a memorandum on the face of the policy at the time of making the same. Issue was joined on the plea of unseaworthiness. On the trial it appeared that, before the

execution of the policy, the plaintiff wrote letters to the defendant describing the dimensions of the ship, and stating that she was a new iron steamer, and took no cargo, only coal enough for her use to Gibraltar. The ship was intended, after accomplishing the voyage, to be employed in river navigation only, and was, as to her hull, built and adapted to such navigation exclusively, and could not by any strengthening appliances be rendered fit to encounter the ordinary perils of the voyage; but, before commencing the voyage, certain appliances were put into and upon her hull to assist her in encountering the perils of the voyage.

The lord chief justice instructed the jury, "That if in their opinion the plaintiff had, before the execution of the policy, brought to the knowledge of the defendant the nature and description of the vessel intended to be insured, and the more than ordinary risk that such a vessel would necessarily encounter on the voyage insured, and if in their opinion the vessel at the time of commencing the insured voyage had been and was by the strengthening appliances put into and upon her hull, made as seaworthy for the insured voyage as a vessel of such a nature and description could reasonably be made, they should find a verdict for the plaintiff on that issue." The jury having found for the plaintiff, an appeal was taken, which resulted in an affirmance of the judgment on the authority of *Burges* v. *Wickham* (*supra*).

It should be said that in *Clapham's* case no opinion whatever was expressed upon the question whether parol evidence as to the character of the vessel was admissible to qualify an ordinary warranty of seaworthiness in a policy, and it may have been that the fact that the policy contained the dimensions of the vessel, showing that it could not possibly have been seaworthy as a sea-going vessel, had a controlling influence in bringing about the decision made, but the fact appears that parol evidence as to the character of the vessel was received by the trial court, and on the appeal BLACKBURN, J., contended that an ordinary warranty of seaworthiness could not be qualified by evidence of that character, but upon that proposition the court expressed no opinion. Our attention is not called to any case in this jurisdiction where this question has been considered, but in fire insurance cases the Court of Appeals has held that even where there is an express warranty it is competent, for the

First Department, January Term, 1895.    [Vol. 84.

purpose of avoiding it, to show by parol evidence that the insurer knew at the time of the facts constituting the breach. It is difficult to discover any principle upon which a distinction between the two classes of cases can be found. In the case of *Bidwell* v. *North Western Ins. Co.* (24 N. Y. 302) parol evidence was admitted to show scienter on the part of the assurer at the time of the application, and the court says: " Indeed, it is not easy to perceive why an insurance company, by reason of the formal words or clauses (of a general and comprehensive nature) inserted in a policy, intended to meet broad classes of contingencies, should ever be allowed to avoid liability on the ground that facts of which the company had full knowledge at the time of issuing the policy were then not in accordance with the formal words of the contract or some of its multifarious conditions. If such facts are to be held a breach of such a clause they are a breach *eo instanti* of the making of the contract and are so known to be by the company as well as the insured, and to allow the company to take the premium without taking the risk would be to encourage a fraud."

In each of the cases of *Van Schoick* v. *Niagara Fire Insurance Company* (68 N. Y. 434); *Woodruff* v. *Imperial Ins. Co.* (83 id. 133), and *Short* v. *Home Ins. Co.* (90 id. 18), oral evidence was received showing a situation in contravention of an express warranty contained in the policy, and that the insurer had knowledge of such situation when the policy was issued. Evidence of this character was received, not for the purpose of contradicting the written agreement, but to demonstrate that the insurer had knowledge of the facts at the time the policy was issued, which it relied upon on the trial as constituting a breach of warranty. Upon such proof was predicated an estoppel, the object of the rule being to prevent fraud, and to render it impracticable for insurers to attempt acquisition of premiums upon policies understood by them to be invalid when issued.

The defendant further contends that the plaintiffs were not entitled to recover because of the vessel's delay in going on the voyage after the issuing of the policy. The statement or title of the policy was " steamer on voyage," and the insurance was " at and from Philadelphia to Frontera, Mexico," which constituted an implied warranty on the part of the assured, among other things, that the

vessel, at the time of the issuing of the policy, was about to sail upon her voyage, subject only to such reasonable delay as should be proper and necessary to enable her to complete her loading and immediate preparations for the voyage. When a delay, which is relied upon by the insurer to avoid a policy, occurs in the ordinary course of loading and unloading, and making such preparation for the voyage as the insured deems necessary and proper, the question whether the delay is reasonable or unreasonable is ordinarily a question of fact for the jury. (*Mount* v. *Larkins*, 8 Bing. 108; *Arnold* v. *Pacific Mut. Ins. Co.*, 78 N. Y. 7.)

But the defendant urges that where the delay is occasioned by circumstances outside of the ordinary course and procedure of the voyage insured against, which amount to a distinct change of risk, or which in the nature of the voyage necessitates a non-fulfillment of any of the warranties expressed or implied on the part of the insured, the delay avoids the policy.

The defendant cites the following statement of the rule from Arnould on Marine Insurance (5th ed. 484): " In short, whenever the delay exists an unreasonable time, or is incurred for purposes unconnected with the true object of the voyage insured, it will amount to a deviation."

In the former case it is said whether the delay is reasonable or unreasonable is for the jury, but in the latter, that if the facts are undisputed, a question of law is presented for the court.

This rule has been frequently the subject of application by the courts and discussion by text writers. (3 Kent's Com. 313; Arnould on Marine Insurance, §§ 223–405, 457–484; *Williams* v. *Shee*, 3 Camp. 469; *Hermann* v. *Western M. & F. Ins. Co.*, 13 La. 517; *Natchez Ins. Co.* v. *Stanton*, 10 Miss. 340; *Matter of Ewmark*, 1 Sum. 400; *Hammond* v. *Reid*, 4 B. & Ald. 72; *Tasker* v. *Cunninghame*, 1 Bligh, 87.)

The evidence conclusively establishes that the risk of taking a vessel of this character to Frontera is far greater in September than in July.

A number of witnesses testified, and without any contradiction whatever, that the risk was greater in August than in July, and greater in September than in August.

The policy of insurance was issued June twenty-eighth, and not

until August twenty-seventh did the *Dos Hermanos* start on her voyage. Thus there is before the court evidence tending to show that the risk was in fact enhanced by the delay; but, entirely independent of that fact, the defendant contends that the delay was not in the ordinary course and procedure of the voyage, but was occasioned by circumstances outside of those contemplated by the contract of insurance, " at and from " one port to another, and, therefore, the policy was avoided. But, as we read the decision in *Fernandez* v. *The Great Western Ins. Co.* (48 N. Y. 571), it is directly in point and against defendant's position. In that case defendant insured plaintiff's vessel, then lying in the port of New York, undergoing repairs, " at and from New York to Havana." Evidence was given to show that the underwriter was informed that the vessel was undergoing extensive repairs, and was being thoroughly remodeled; the court said : " The insurance covers the vessel while in port preparing for her voyage. The rule is that such delay must be for a reasonable time only. *  *  * Were there no excusing facts in the case, a delay of 45 days in the clearing of a ship, whose intended voyage would occupy only five or six days, would appear to be unreasonable. *  *  * If, on the other hand, the vessel was in good order for river navigation, but was being remodeled and substantially rebuilt to fit her for an ocean steamer, several weeks might well be exhausted in that duty. Again, this vessel while under repairs, met with various disasters and calamities which delayed her completion. I cannot discover such a state of facts as, upon the principles of law laid down by the appellants, would justify the court in saying that, as matter of law and necessarily, there was a breach of the warranty that the vessel should sail in a few days. The jury might have so found, but the question was not submitted to them and neither party asked that it should be."

It is clear that under this decision the facts in the case under review presented a question for the jury whether the delay was for an unreasonable time, and the court did not err in refusing to hold, as matter of law, that the delay constituted such a deviation as to avoid the policy.

The *Fernandez* case is cited by the defendant as authority for its further contention that the trial trips of the steamboat *Dos Hermanos* constituted such a deviation as to avoid the policy.

In that case, after the policy had been issued, the vessel went on a trial trip to Elizabeth, N. J., a distance of sixteen miles, to test her engines, and to take on coal. After being loaded she returned to New York, subsequently sailed to Havana, and while prosecuting her voyage was destroyed by fire. The court held that the trip to Elizabeth was in violation of the terms and conditions of the policy and operated to avoid it, because not excused on the ground of necessity. The plaintiffs sought to obviate the difficulty by the argument that the trip to Elizabeth was a trial trip, but to this the court made answer : "No necessity is shown for the vessel in this case to go out of the limits of the port of New York. Apparently, she could have been tested as well by going down the bay to Staten Island as by going to Elizabeth. * * * The opportunity to test her fitness for the sea could have been perfectly attained without going to another port, in another state, at a distance of eighteen or twenty miles." Thus was recognized the necessity of trial trips for new vessels, which are both usual and customary. The trial trips of plaintiffs' boat seem to have been of this character. On the first one defects were developed which necessitated their correction, and the engineer directed a second trial trip, which was taken down the river.

The vessel did not land on either of the trips, and the testimony of the witness Tucker was to the effect that the vessel did not go out of the limits of the port of Philadelphia.

The most favorable view of this question which the trial court could have taken for the defendant was, that it was for the jury to say whether the trial trips were prudent or necessary, and the defendant is without exception to the charge of the court in such respect.

Defendant's exceptions should be overruled, and judgment directed for the plaintiffs upon the verdict, with costs.

VAN BRUNT, P. J., and FOLLETT, J., concurred.

Exceptions overruled and judgment directed for plaintiffs upon the verdict, with costs.