**INDUSTRIAL WAXES, Inc., Plaintiff,**
v.
**Gerald Few BROWN, Defendant.**

United States District Court
S. D. New York.
July 22, 1957.

232

Milton B. Ignatius, for plaintiff, Lester C. Lockwood, Jr., and Joseph S. Catalano, New York City, of counsel.

Dow & Stonebridge, New York City, for defendant, Daniel L. Stonebridge and Raymond W. Mitchell, New York City, of counsel.

RYAN, District Judge.

This suit has been filed by Industrial Waxes, Inc., an Ohio corporation, as plaintiff against certain named underwriters at Lloyd's to recover under contracts of insurance for losses alleged to have been sustained by plaintiff due to the destruction by fire of two shipments of Industrial Waxes, totaling approximately 200 tons. The losses befell while the goods were stored in a customs warehouse at Valparaiso, Chile.

The complaint alleges that jurisdiction is based on diversity and it was stipulated at trial that New York law applied in determining all legal rights of the parties involved and particularly in determining plaintiff's right to maintain this suit—that is, whether plaintiff was the owner in law of the insured shipments,—and the construction and interpretation of the terms of the policy.

Trial to the Court presented no issue to the following material facts.

Plaintiff has for many years been engaged in the business of selling and shipping industrial waxes to customers throughout the world. It had insured all shipments made from the United States with Lloyd's underwriters under an open cover contract. Lukis, Stewart & Co., insurance brokers at Montreal, were authorized to issue each year a memorandum of open cover setting forth the conditions, terms and rates for particular shipments to be covered following declaration by the plaintiff. There issued in this suit memorandum of open cover No. 50/4058 which was effective for the year October 30, 1950 to October 29, 1951. The procedure followed was that Lukis furnished plaintiff with a number of forms of Lloyd's Certificates of Insurance whereon plaintiff declared each shipment to be insured, the commodity shipped, its value, port of exit, destination and course of voyage. When so declared and signed by plaintiff, the original of the declaration would go forward with the shipping documents and a copy would be sent to Lukis who would in turn bill plaintiff at rates scheduled in the open cover and collect the premium due. The two shipments in suit were declared, covered and the premiums paid.

These shipments were the last of five to be forwarded by plaintiff under a contract to sell five hundred tons of waxes to Sociedad Nacional de Velas, S. A. (Sonavelas) of Santiago, Chile. This contract of February 9, 1951 provided that the shipments would be made in lots of about 100 tons per month beginning March, 1951 and that the terms of payment were cash against documents. The confirmation of this order listed as base of the sale "FOB, C & F, CIF, $7.80 per one hundred lbs. FAS New Orleans." This is to be read that the goods were sold CIF Valparaiso, FOB New Orleans. The rate of exchange applicable to the contract was 60 pesos per dollar. Approximately 300 tons had been shipped and received by the purchaser before the first of the two shipments in suit left Tulsa, Okla., on March 30, 1951.

This shipment arrived at Valparaiso, the recognized point of entry for importation to Santiago, on May 4, 1951. The second of the shipments left Tulsa on May 18, 1951 and reached Valparaiso on July 8, 1951. An import license bearing No. 192 for the entry of these goods into Chile had been previously issued by the authorized Chilean government agency. Each shipment upon arrival at Valparaiso was placed in customs and remained there until destroyed by fire on October 5, 1951. The first—having been in customs for a period of 5 months and the second almost three months. But a delay of this length in a customs' warehouse pending entry was neither unusual nor unexpected and was long a matter of common knowledge to exporters to the West Coast of South America. I find all parties chargeable with knowledge of these conditions. Shipments frequently were required to remain in customs at Valparaiso pending release and clearance of dollars to meet the sight drafts and invoices which accompanied and were part of the shipping documents. This dollar clearance was under the control of and issued from an agency of the Chilean government, "Condecor". When the shipments had arrived in Chile, dollar exchange was tight and under strict control by Condecor; indeed prior shipments under the contract had also rested in customs at Valparaiso pending release of dollars for similar periods. It is not contended that the deposit of the goods in the customs warehouse at the port constituted a deviation in or abandonment of the insured voyage.

Plaintiff to secure payment from Sonavelas had forwarded through its American bank to the Banco de Chile at Santiago drafts for collection with each shipment. The Banco de Chile notified the consignee-purchaser Sonavelas of the arrival of each shipment and that it was holding the documents subject to collection, who in turn applied through government channels for license or permission to purchase the necessary United States dollars to effect the release and delivery of the shipping documents to it by the Banco de Chile. After each shipment had been in customs at Valparaiso for more than thirty days the Banco de Chile, without specific instructions from the plaintiff, effected insurance on the two shipments in Cia Franco-Chilena de Seguros against risk of fire. The cost of this insurance was charged to Sonavelas; plaintiff was not furnished with any policy of insurance so written and has not seen the policy and has no knowledge of its terms or conditions.

The loss by fire was duly reported by plaintiff to Gibbs y Cia. the defendant's designated agents at Valparaiso and they inspected the shipments at the warehouse and found them a total loss.

Following the fire the plaintiff with the concurrence of defendant and at their suggestion retained a Chilean attorney to enforce collection under the Chilean insurance for the account of the plaintiff or the defendant. After due notice to the defendants of a contemplated settlement and an offer to the defendants to allow them to participate in the settlement and their refusal to do so, the claim against the insurer in Chile was settled and plaintiff collected from it 3,617,414 pesos, less 236,869.64 pesos expenses for collection charges. Plaintiff has held this amount in pesos available to defendants.

It is upon these undisputed facts that plaintiff seeks to recover $43,803 the insured value of the two shipments covered by the policy issued by defendant and lost by fire on October 5, 1951. We conclude that the plaintiff is entitled to judgment against the defendants in that amount with interest and costs of this suit.

Defendant urges by way of defense:

1. That plaintiff is not the real party in interest, contending that title to the shipments passed to Sonavelas under the contract of sale prior to the loss.

I must examine the contract between Industrial and Sonavelas to ascertain when title to the goods passed from one to the other.

The order of February 6, 1951 sent from Santiago and addressed to plaintiff at Cincinnati, O., by M. S. McGoldrick (Ex. 2 of P.T. order) recites on its face: "Condiciones—Pagadero contra documentos per el Banco de Chile" (Conditions—Payment against documents through the Banco de Chile); printed on the reverse is: "Notes: 1. Waxes is to arrange shipment of this material to Valparaiso de Chile at customer's risk and expense. Marine and War Risk Insurance will be covered for an amount equivalent to invoice value, plus freight and insurance charges, increased by 10% from refinery to Santiago." The written acceptance of this order by plaintiff, dated February 19, 1951 (Ex. 3 P.T. order) addressed to Sonavelas recites:

"Base of Sale: F. O. B., C & F, CIF—$7.80 per 100 # FAS New Orleans,

"Terms of payment—Net cash against documents."

The shipments were carried from the loading port of New Orleans to the port of discharge, Valparaiso, by Gulf & South American Steamship Co., Inc. and the vessel the Gulf Shipper, which issued its bill of lading stating the shipper as plaintiff and the consignee as "Order: Industrial Waxes, Inc." On each shipment the plaintiff sent to the Banco de Chile its sight draft payable to the order of its own bank, the First National Bank of Cincinnati, and drawn on the Sociedad Nacional de Velas, S. A.; enclosed with each draft were a legalized invoice, forwarder's bill of charges, insurance certificate (of defendant) in duplicate and a full (3) set of ocean bills of lading for the shipment; the invoices notes terms of sale "net cash against DD/BL through Banco de Chile."

 The bill of lading to the order of the plaintiff-seller is the usual one found in CIF contracts. Under the terms of sale—FOB, CF, CIF, FAS New Orleans, the cost of freight and insurance were borne by the purchaser Sonavelas—presumptive evidence that title to the goods had passed to Sonavelas upon delivery to the carrier at New Orleans. There is nothing to the contrary in the contract to rebut this presumption, for the bill of lading to the order of the seller was not a retention of full title in it but merely retention of bare legal title in order to exercise a right of possession over the shipment until it had received payment from the purchaser Sonavelas. The shipment was made in conformity with the contract, upon delivery to the carrier Sonavelas became the beneficial owner of the goods upon whom any subsequent loss or damage to the goods would fall and who consequently protected his title by paying all the freight and insurance charges. Sec. 101 (2), New York Personal Property Law, McKinney's Consol. Laws, c. 41. In the event, however, of inability or refusal on the part of Sonavelas to take up the documents from the Banco de Chile and pay over to the Bank for the account of plaintiff the purchase price, plaintiff had the right under the bill of lading to take possession of the shipment and dispose of it to another. Badhwar v. Colorado Fuel & Iron Corp., 2 Cir., 1957, 245 F.2d 903; Standard Casing Co. v. California Casing Co., 233 N.Y. 413, 135 N.E. 834; Pottash v. Cleveland-Akron Bag Co., 197 App.Div. 763, 189 N.Y.S. 375, affirmed 235 N.Y. 520, 139 N.E. 717; Williston on Sales, Sec. 280.

The insurance certificate was taken out by plaintiff under the terms of the contract of sale but the loss was made payable "to party of interest at destination,"—which might be either plaintiff or Sonavelas depending upon the circumstances existing at the time of the loss. The "jus disponendi" retained by plaintiff was insurable prior to acceptance of the documents and payment by Sonavelas; after payment certainly the purchaser's beneficial title was insurable. The drafts were never paid by Sonavelas and no part of the purchase price including the cost of insurance has been received by plaintiff. I find that at the time of the fire plaintiff was the "party in interest." Cf., Harper v. Hochstim, 2 Cir., 278 F. 102; Hooper v. Robinson,

98 U.S. 528, 25 L.Ed. 219; Cerro De Pasco Copper Corp. v. Knut Knutsen, D. C., 94 F.Supp. 60.

2. That upon the expiry of 30 days after the discharge of the shipment from the vessel at Valparaiso, defendant's responsibility ceased by reason of the contract of insurance.

 This defense which I conclude to be neither valid nor sustained requires that I analyze the open cover and the certificate of insurance which issued.

The open cover was a contract to insure and it set forth (save where modified or extended by the subsequent certificate) the terms and conditions under which the insurance would attach to shipments; the certificate of insurance subsequently written constitutes the contract or policy of insurance.

The open cover provided for coverage on voyage "to, from and/or between places Anywhere in the World * * * against all and every loss or damage of whatsoever nature," on the basis of "selling price plus shipping expenses to destination plus 10% unless otherwise agreed prior to known or reported loss or damage." It is conceded that the schedule of rates specified in the open cover for shipments to the West Coast of South America—"Interior"—which were about 10% higher than the rates to "Ports" on the West Coast of South America were in fact paid on the shipments. The schedule of rates also specified an additional premium of 0.125% for "Warehouse extension—each thirty days, or part thereof, in excess of the first thirty (30) days." The premium elected and paid by plaintiff after billing by defendant was at the rate of .78625% the higher rate for carriage to Santiago, rather than the lower rate of .68% for carriage to Valparaiso. This was in accordance with the express terms of the sale between plaintiff and Sonavelas where it was provided that the shipping documents were to be paid at the Banco de Chile in Santiago and that the destination of the shipment was Santiago via Valparaiso and that the freight and insurance charges were to be from "refinery to Santiago." The currency payable in event of loss is specified in the open cover: "Limit—$500,000(US) any one vessel each Assured." The certificate of insurance on each shipment here involved provided for dollar valuation and loss payment at and from "Tulsa, Okl. via New Orleans via Valparaiso, Chile to Santiago, Chile, subject to the terms of the Standard Form of Lloyd's Marine Policy and to the special conditions stated below and on the back hereof." I need not concern myself with the terms of the Standard Form policy as they do not bear on the question of liability here present; I shall later turn to the conditions stated on the back of the certificate of insurance.

The open cover had attached to and made part of it the printed form "Institute Cargo Clauses (W.A.)" (printing of 11/2/46). Defendant calls our attention to clause 1. which is designated as the "Warehouse to Warehouse Clause." It provides in substance that the insurance attached from the time of the commencement of the transit and continues during the ordinary course of the transit, including customary transshipment, until the goods are discharged overside from the overseas vessel at the final port. It then reads, "Thereafter, the insurance continues whilst the goods are in transit and/or waiting transit until delivered to final warehouse at the destination named in the policy or until the expiry of 15 days (or 30 days if the destination to which the goods are insured is outside the limits of the port) whichever shall first occur." "Held covered at a premium to be arranged * * in the event of delay in excess of the above time limits arising from circumstances beyond the control of the assured."

On the face of the certificates of insurance—the printed forms supplied by defendant and filled in by plaintiff—there is typewritten by plaintiff the sentence: "Includes risk for additional thirty days after discharge from vessel," and this follows another typewritten sen-

tence: "Insure customer against all risks to customer's warehouse also particular average and loss in customs."

It is upon the Warehouse to Warehouse Clause of the Open Cover and the second sentence typewritten by plaintiff ("Includes risk, etc.") that the defendant relies to sustain its position that plaintiff was not covered at the time of the loss.

Putting aside for the moment the effect of plaintiff's rider, it is significant that the Warehouse to Warehouse Clause is only part of the open cover and that not only is it not physically a part of the certificate itself but is specifically excluded therefrom from being read in, by the "Cargo Clause (Wartime Extension)" printed on the reverse of the certificate by defendant to plaintiff, to wit:

"Clauses 1, 3 and 4 of the Cargo Clauses are deemed to be deleted and the following clauses substituted:—

"1. This insurance attaches from the time the goods leave the warehouse at the place named in the policy for the commencement of the transit and continues until the goods are delivered to the final warehouse at the destination named in the policy * * *"

While the certificates of insurance did not issue and the loss did not occur in wartime and this clause is described as "wartime extension", nowhere in the body thereof does the word "wartime" appear, none of its terms are so limited and nowhere else in the policy is there any indication that its application is to be so limited. It became an integral part of the contract of insurance and operated to delete Clause 1 of the Warehouse to Warehouse Clause of the open cover.

It is conceded by defendant that the certificate of insurance on its face "insured the goods against risks to customers warehouse in Santiago and against loss in customs." This is evident from the destination named on the face of the policy—Santiago, via Valparaiso—and the endorsement to that effect inserted by plaintiff and accepted by defendant. But, defendant argues, by adding the second endorsement plaintiff limited the above coverage to "thirty days after discharge from vessel"—so that if the shipments did not reach Santiago within thirty days they were no longer covered to Santiago or anywhere else for that matter. In effect, what defendant says is that plaintiff after paying a 10% higher premium limited its coverage to what it would have had under the lower premium. Plaintiff was an experienced shipper well aware of the risks attendant upon the delays encountered by shipments arriving at ports on the West Coast of South America. Because of the difficulty in ascertaining whether goods discharged were still in transit 30 days after leaving the vessel, and in need of additional insurance as provided by the Extension clause, plaintiff had for some time been paying at the outset the higher interior rate in order to protect the goods until their final destination. With this background it is difficult to conclude that plaintiff by this customary and routine endorsement (such was the testimony) was unintentionally curtailing what it had intentionally extended; nor, assuming the endorsement had the effect contended by defendant, would this satisfactorily explain why defendant billed plaintiff at the higher rate.

Without entering upon a semantics discussion I do not read the words "includes" as "limits" so as to narrow an otherwise broad liability concededly undertaken, but rather as to emphasize one specific portion of the overall coverage.

For, although plaintiff had paid the higher premium of .78625% to Santiago (with no time limitation), this was not so high a rate as the combined .68% premium to port only, plus the .125% premium for an additional 30 days (a total of 60 days), as provided by the Warehouse to Warehouse and Warehouse Extension Clauses. In other words what

plaintiff wanted to make clear was that for the proportionately lower premium it was receiving *at least* the protection it would have by paying a total rate of .805%—as set forth in the Warehouse Clauses. So that in the event the shipment after discharge did not continue on its voyage to Santiago, but was forced because of unforeseen circumstances or a delay in customs to remain in Valparaiso beyond 30 days it would continue covered—as if plaintiff had taken out an additional premium under the Warehouse Extension Clause. That this is so is further evidenced by the clause on the face of the policy providing for inclusion of risk "whilst in store after arrival at port of discharge," "held covered at an additional premium", *"if so declared hereon."* It is obvious that plaintiff was acting out of an abundance of unnecessary caution, as I have held that the warehouse to warehouse clause with its time limitations was no part of this policy of insurance; the endorsement was therefore surplusage having no effect on the coverage provided by the certificate and paid for by plaintiff.

I conclude that there is no merit to this defense, as I find that the shipments were insured while reasonably delayed in customs awaiting release of American dollars when the loss took place.

3. That the periods of time for which the shipments were permitted to remain in customs were not normal nor within the contemplation of the parties to the insurance contract.

■ Neither the open cover nor the certificate contains any restriction on the period during which the goods might be held in customs. The delay in customs was neither unusual nor unexpected. It was, on the contrary, such a common experience with shipments to this coast that defendant had had to set its insurance rates on such shipments "much higher" than to other ports. It was well within the contemplation of the parties, and did not serve to discharge the defendant although it may have been of considerable duration. Arnold v. Pacific Mutual Ins. Co., 78 N.Y. 7.

Sonavelas had made the necessary deposits of pesos and other arrangements with the Banco de Chile to effect the payment of the drafts; the issuance of the Chilean import license was in effect a guaranty that dollars would be available but without a guaranty of time as to when this would be. "Condecor" had not released the dollars; in any event the sight drafts had not been met when the loss occurred.

■ I find no evidence to support a finding that plaintiff neglected to take all reasonable steps to secure payment of the drafts.

I conclude this defense to be without substance.

4. The existence of the insurance policy issued by Cia Franco-Chilean de Seguros evidence that plaintiff and/or its agent understood that defendant's contract of insurance had lapsed; payment by Cia bars recovery here from defendant.

As to the first part of this defense I observe that it has been stipulated that the Banco de Chile, without specific instructions from plaintiff, applied for and secured the issuance of the Chilean insurance. What the plaintiff then thought its rights against the defendant were is immaterial; at present it is asserting their liability. As a practical matter, since under the CIF sale plaintiff was to insure the goods from the refinery to Santiago it would have been easier—assuming the defendant's insurance had ended, to continue being fully covered by defendant's policy upon payment of an additional premium every thirty days, rather than to substitute a much more limited protection payable in case of loss in pesos rather than dollars (US).

At trial the second part of this defense was phrased—that plaintiff has been compensated for its loss by another insurer (the Chilean insurer) and that any loss not compensated for by the Chilean Company, results from loss in the exchange, for which defendant is not responsible. Expanding this the defendant

urges that, the rate of exchange applicable to the contract of sale was sixty pesos per dollar; that plaintiff has recovered and is now holding 3,380,544 Chilean pesos; that this sum is the net proceeds of a policy of fire insurance taken out by plaintiff's agent covering the shipments; and that plaintiff never attempted to convert the pesos into dollars but that only after defendant (without in any way admitting liability or waiving defenses) urged action did plaintiff press its claim against the Chilean Insurance company. Thus, the defendant urges that plaintiff failed to mitigate its loss and that the fall in the value of the Chilean peso during the time that plaintiff failed to press its claim against the Chilean insurer is the sole cause of its loss.

■ The Chilean insurance, however, was payable only in pesos and it has been stipulated that the arrangement for the collection on this policy was at the suggestion of the defendant, and with the understanding that the collection when made was to be for the account of whom it may concern. The proceeds of the collection have at all times been held available to defendant. Above all, by immediate payment of the loss on the insurance written by it, defendant would have been forthwith subrogated to any rights of plaintiff under the Chilean policy and could then have proceeded to enforce liability on this policy and collect the pesos and convert them before the fall in the rate of the exchange. The resultant pecuniary loss from this fall in the exchange can be attributed to defendant's own failure to pay the loss against which it had insured.

I conclude that there is no merit to this defense.

Plaintiff is entitled to judgment against the defendant in the sum of $43,-803 and interest thereon at the rate of 6% per annum from October 5, 1951 to date of entry of judgment, together with taxable costs and disbursements of this suit. The clerk is directed to enter judgment accordingly.